IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SPHERIX INCORPORATED,

     Plaintiff,

    v.

VTECH TELECOMMUNICATIONS LTD.
and VTECH COMMUNICATIONS, INC.

     Defendants.

Civil Action No. 3:13-cv-3494

JURY TRIAL DEMANDED

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement in which Plaintiff, Spherix Incorporated ("Spherix"), makes the following allegations against Defendants VTech Telecommunications Ltd. ("VTech Telecommunications"), and VTech Communications, Inc. ("VTech Communications") (collectively, "VTech") based on personal knowledge, the investigation of its counsel, and information and belief:

## PARTIES

1.    Plaintiff Spherix Incorporated is a Delaware corporation, with its principal place of business at 7927 Jones Branch Drive, Suite 3125, Tysons Corner, VA 22102.

2.    Defendant VTech Telecommunications is a corporation organized and existing under the laws of Hong Kong, with its principal place of business located at 23/F, Tai Ping Industrial Centre, Block 1, 57 Ting Kok Road, Tai Po, N.T. Hong Kong.  VTech Telecommunications is a wholly-owned subsidiary of VTech Holdings, Inc., which is also based in Hong Kong.

3.    Defendant VTech Communications is a corporation organized and existing under the laws of the State of Oregon, with its principal place of business located at 9590 SW Gemini

Drive, Suite 120, Beaverton, OR 97008.  VTech Communications also does business as

Advanced American Telephones, which manufactures and distributes AT&T-branded home and

office telephones under an agreement with AT&T.  VTech Communications is a wholly-owned

subsidiary of Hong Kong-based VTech Holdings, Inc. VTech Communications may be served in

Dallas via its registered agent for service of process, National Registered Agents, Inc., at 350 N.

St. Paul Street, Suite 2900, Dallas, TX 75201.

4.      VTech Telecommunications' principal activities are the design, manufacture, and

distribution of telecommunications products in and from China, including the infringing products

identified below.  VTech Communications' principal activity is the promotion, instruction, sale

and distribution of VTech Telecommunications' and Advanced American Telephones' products

in the United States.

## JURISDICTION AND VENUE

5.      This action arises under the patent laws of the United States, Title 35 of the

United States Code.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331

and 1338(a).

6.      This Court has personal jurisdiction over both VTech Defendants.  Both VTech

Defendants have conducted extensive commercial activities and continue to conduct business

within the State of Texas.  Both VTech Defendants, directly or through intermediaries,

manufacture, ship, distribute, offer for sale, sell, support, or advertise their products (including,

but not limited to, the products and services that are accused of infringement in this lawsuit) in

the United States, the State of Texas, and the Northern District of Texas.

7.      Both VTech Defendants, directly or through intermediaries, have purposefully

and voluntarily placed one or more of their products and services (including, but not limited to,

the products and services that are accused of infringement in this lawsuit) into the stream of commerce in the Northern District of Texas and elsewhere, including without limitation from and through VTech's consumer sales website, www.vtechphones.com, other retail websites, and from and through VTech's retail distribution network, including Wal-Mart, Best Buy, Circuit City, Costco, Office Depot, Staples, Target, and others.  Both VTech Defendants place such products and services into the stream of commerce with the expectation that the products and services will be purchased by customers in Texas, including in the Northern District of Texas. These infringing products and services have been and continue to be purchased by customers in the Northern District of Texas.  Accordingly, both VTech Defendants have committed the tort of patent infringement within the State of Texas, and, more particularly, within the Northern District of Texas as alleged in more detail below.

8.      Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(b).

### THE ASSERTED PATENTS

9.      This lawsuit asserts causes of action for infringement of United States Patent Nos. 5,581,599; 5,752,195; 5,892,814; 6,614,899; and 6,965,614 (collectively, the "Asserted Patents").  The inventions disclosed in the Asserted Patents were conceived and created by inventors that were working for an entity within or related to the Nortel corporate family at the time of the invention ("Nortel").  During bankruptcy proceedings several years later, Nortel sold the Asserted Patents to a consortium of technology companies known as Rockstar Bidco, L.P. Based on a purchase agreement and assignment from Rockstar Consortium US LP, Plaintiff Spherix owns the Asserted Patents, and has the exclusive right to sue for infringement and recover damages for all past, present, and future infringement.

**UNITED STATES PATENT NO. 5,581,599**

10.     On December 3, 1996, the United States Patent and Trademark Office ("PTO") duly and legally issued United States Patent No. 5,581,599 (the "'599 Patent"), entitled "CORDLESS TELEPHONE TERMINAL," to inventors Bruce H. Tsuji, Susan J. McGarry, and Steven W. Sparksman, after a full and fair examination.  A true and correct copy of the '599 Patent is attached as **Exhibit A**.

11.     Spherix is the owner of the entire right, title, and interest in and to the '599 Patent by assignment, and has the exclusive right to sue for infringement and recover damages for all past, present, and future infringement, including against VTech.

12.     The '599 Patent is generally directed to technology to coordinate communication and operation of a cordless phone's handset and base.  As set forth in the patent's abstract (reproduced below), the patent teaches core technology that enables a handset to access information and functions on the base:

[57]          **ABSTRACT**

An interactive cordless telephone handset having an alphanumeric data display system is in radio communication with an associated base station to which voice and data signals are conducted over a telephone line. Received caller identification data is tested for validity and is stored in a limited storage Callers List memory of the base station if found valid. Subsequently, the data is transmitted to the handset over a radio link of limited range, with the received data being formatted and conducted to a display screen for identifying the caller by name and telephone number prior to answering the call. Although caller identification is erased from the display after the call, it is retained in the Callers List memory of the base station where it may be accessed by the handset via softkeys and dedicated dialpad keys for subsequent display and editing and optional transfer to a general directory for long term storage in a nonvolatile memory of the base station.

**UNITED STATES PATENT NO. 5,752,195**

13.     On May 12, 1998, the PTO duly and legally issued United States Patent No.

5,752,195 (the "'195 Patent"), entitled "CORDLESS TELEPHONE TERMINAL," to inventors

Bruce H. Tsuji, Susan J. McGarry, and Steven W. Sparksman, after a full and fair examination.

The '195 Patent is related to the '599 Patent, it is a continuation of the application that issued as

the '599 Patent.  A true and correct copy of the '195 Patent is attached as **Exhibit B**.

14.      Spherix is the owner of the entire right, title, and interest in and to the '195 Patent

by assignment, and has the exclusive right to sue for infringement and recover damages for all

past, present, and future infringement, including against VTech.

15.     The '195 Patent is generally directed to technology to coordinate communication

and operation of cordless phone handsets and the base.  As set forth in the patent's abstract

(reproduced below), the patent teaches core technology that enables a handset to access

information and functions on the base:

[57]          **ABSTRACT**

An interactive cordless telephone handset having an alpha-
numeric data display system is in radio communication with
an associated base station to which voice and data signals are
conducted over a telephone line. Received caller identifica-
tion data is tested for validity and is stored in a limited
storage Callers List memory of the base station if found
valid. Subsequently, the data is transmitted to the handset
over a radio link of limited range, with the received data
being formatted and conducted to a display screen for
identifying the caller by name and telephone number prior to
answering the call. Although caller identification is erased
from the display after the call, it is retained in the Callers
List memory of the base station where it may be accessed by
the handset via softkeys and dedicated dialpad keys for
subsequent display and editing and optional transfer to a
general directory for long term storage in a nonvolatile
memory of the base station.

## UNITED STATES PATENT NO. 5,892,814

16.     On April 6, 1999, the PTO duly and legally issued United States Patent No. 5,892,814 (the "'814 Patent"), entitled "FLEXIBLE, TAPELESS, PERSONALIZED AUTO-ATTENDANT TELEPHONE," to inventors Michel Joseph A. Brisebois and Robert Barrie Turnbull, after a full and fair examination.  A true and correct copy of the '814 Patent is attached as **Exhibit C**.

17.     Spherix is the owner of the entire right, title, and interest in and to the '814 patent by assignment, and has the exclusive right to sue for infringement and recover damages for all past, present, and future infringement, including against VTech.

18.     The '814 Patent is generally directed to technology for intelligently and automatically processing incoming calls.  As set forth in the patent's abstract (reproduced below), the patent teaches technology that enables the phone to automatically process calls based on caller information or input:

[57]              **ABSTRACT**

A method of operating a subscriber terminal to provide a flexible tapeless personalized auto-attendant telephone by means of measuring ring cadence of an incoming telephone call; and selecting one outgoing message in response to the ring cadence and playing it after a predetermined number of rings. The method also provides for the selection of group greetings and mailboxes automatically, for example, based on CLID and name match in a directory.

## UNITED STATES PATENT NO. 6,614,899

19.     On September 2, 2003, the PTO duly and legally issued United States Patent No. 6,614,899 (the "'899 Patent"), entitled "METHOD AND APPARATUS FOR PROVIDING ADVANCED IP TELEPHONY SERVICES IN AN INTELLIGENT ENDPOINT," to inventors

Patrick Sollee, Christopher Jessen, and Robert Barretto, after a full and fair examination.  A true and correct copy of the '899 Patent is attached as **Exhibit D**.

20.     Spherix is the owner of the entire right, title, and interest in and to the '899 patent by assignment, and has the exclusive right to sue for infringement and recover damages for all past, present, and future infringement, including against VTech.

21.     The '899 Patent is generally directed to technology for data-network-based telephony with intelligent endpoints.  As set forth in the patent's abstract (reproduced below), the patent teaches technology that enables phones to connect to information and functions available on the data network:

(57)          **ABSTRACT**

A method and apparatus in a communications system for providing advanced Internet Protocol (IP) telephony services in an intelligent endpoint. The apparatus and method of the present invention provides a user with the capability to update a local directory from a directory server, perform click to call functions, and perform intelligent processing of incoming calls.

**UNITED STATES PATENT NO. 6,965,614**

22.     On November 15, 2005, the PTO duly and legally issued United States Patent No. 6,965,614 (the "'614 Patent"), entitled "METHOD AND SYSTEM FOR COMMUNICATIONS BETWEEN DIFFERENT TYPES OF DEVICES," to inventors Gregory T. Osterhout, James A. McAlear, and Mark A. Sosebee, after a full and fair examination.  A true and correct copy of the '614 Patent is attached as **Exhibit E**.

23.     Spherix is the owner of the entire right, title, and interest in and to the '614 patent by assignment, and has the exclusive right to sue for infringement and recover damages for all past, present, and future infringement, including against VTech.

7

24.     The '614 Patent is generally directed to methods and systems for communications between various types of devices and network elements, including a gateway providing communications between primary and peripheral devices.  As set forth in the patent's abstract (reproduced below), the patent teaches technology that enables phones to communicate with peripheral devices on the data network:

(57)                    **ABSTRACT**

A communications system includes a packet-based data network coupled to various network elements, including a gateway that provides ports to various peripheral devices. One type of peripheral device includes a Universal Serial Bus (USB) device. A network element coupled to the data network may establish Session Initiation Protocol (SIP) sessions with the gateway. Once a SIP session is established, communications may occur between the network element and the peripheral device. SIP messaging is exchanged between the network element and the gateway. USB commands and data are exchanged between the gateway and the USB device. The gateway converts between the SIP messaging and the USB commands and data.

## FACTUAL BACKGROUND

### NORTEL

25.     All of the inventions disclosed and claimed in the Asserted Patents were originally invented and patented by former Nortel technology employees during the course of their employment.

26.     Nortel's history is inextricably intertwined with the origins of telecommunications.  Alexander Graham Bell invented the telephone in 1874, for which he received a United States patent in 1876 (U.S. Patent No. 174,465) and a Canadian patent in 1877. The Bell Telephone Company (later AT&T) was formed in 1877.  Bell Canada was formed three years later, in 1880.  Nortel was formed as the manufacturing arm of Bell Canada in 1895.  In its early years, Nortel was instrumental in establishing the Canadian telecommunications industry.

By the mid-twentieth century, Nortel matured into a global research-and-development powerhouse.

27.    Each of the former Nortel employee-inventors assigned all of their rights in the Asserted Patents to Nortel.

28.    At its peak in 2000, Nortel had grown to more than 90,000 employees (over 35,000 in the United States alone), had a market capitalization of nearly $300 billion, and had yearly revenues approaching $30 billion.  In 2000 alone, Nortel spent nearly $4 billion on research and development with over 25,000 research-and-development employees (nearly 10,000 in the United States alone).

29.    Nortel had offices worldwide, with over 100 locations in the United States alone. Nortel headquartered its United States operations at its 800,000-square-foot complex in this Judicial District in Richardson, Texas (pictured below and on the following page[1]).



---

[1] Available at http://www.bizjournals.com/dallas/news/2011/05/24/nortel-networks-to-sell-richardson-hq.html?s=image_gallery (last visited Aug. 26, 2013).



30.     Nortel was a prolific and disruptive innovator in the telecommunications industry. For example, Nortel was one of the first to envision telecommunications over fiber optics; it led the industry's move to the era of digital telecommunications; it was the first to develop a telephone with the controls in the handset rather than in the base; and it contributed to the development of numerous telecommunications standards and created core technology necessary to implement many of those standards. From 1992 through 2009, Nortel invested more than $34 billion into research and development.

31.     Nortel's billions, and the inventiveness of the Nortel technology professionals, directly resulted in Nortel receiving well over 6,000 active patents and patent applications covering wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductor, and other telecommunications as of July 2011. Nortel made patents a priority, and every year Nortel hosted patent award ceremonies at venues such as the Adolphus Hotel in Dallas, and employees received bonuses for their innovations. Each of the five Asserted Patents issued as the result of the inventiveness of Nortel personnel and Nortel's significant research investment.

## NORTEL'S FORMER EMPLOYEE-INVENTORS

32.     The inventors of the Asserted Patents were Nortel employees at the time they created their inventions and assigned all rights in their patented inventions to Nortel.

33.     Bruce H. Tsuji, Susan J. McGarry, and Steven W. Sparksman, the inventors of the '599 Patent and the '195 Patent, were all part of Nortel's research-and-development efforts based in Canada.

34.     Michel Joseph A. Brisebois and Robert Barrie Turnbull, the inventors of the '814 Patent, were also part of Nortel's Canadian research-and-development group.

35.     Patrick Sollee, Christopher Jessen, and Robert Barretto, the inventors of the '899 Patent, were members of Nortel's research-and-development group based in Richardson, Texas.

36.     The '614 Patent is the result of a cross-border collaboration among Gregory T. Osterhout, James A. McAlear, and Mark A. Sosebee.  Messrs. Osterhout and Sosebee were part of the Richardson, Texas team, and Mr. McAlear was based in Ottawa, Ontario.

## NORTEL'S BANKRUPTCY AND THE ROCKSTAR CONSORTIUM

37.     Like many companies in the telecommunications industry, the economic and competitive pressures during the 2000s—including competition from manufacturing operations based in China—resulted in Nortel being forced to restructure, contract in size, and eventually enter bankruptcy.  By the end of 2008, Nortel's full-time-employee count had fallen below 30,000, with approximately 10,000 in the United States.  Nortel's revenues had fallen to less than $10 billion, resulting in an operating loss of greater than $2 billion.

38.     Nortel entered bankruptcy protection in 2009.  As part of the bankruptcy, in what has been declared by some as the "M&A Deal of the Year," Nortel sold a portion of its patent assets for an unprecedented and widely-publicized $4.5 billion—which was $1.3 billion more

than the combined value of all of Nortel's business units that were sold prior to the patent auction.  The purchasers were a consortium of leading technology companies collectively known as Rockstar Bidco, LP.  Among the assets sold to Rockstar Bidco, LP were the Asserted Patents.

39.     Nortel's bankruptcy cost more than 30,000 employees their jobs at Nortel, and left others without pension and life insurance coverage.  Employee pensions were slashed in half when Nortel could no longer meet payment obligations.  Some workers lost life insurance or medical benefits when the company's self-funded programs collapsed.

40.     Rockstar Bidco, LP transferred the patents to Rockstar Consortium US, LP ("Rockstar"), an intellectual-property company built on a core of former Nortel technology and business professionals.  Rockstar, based in Plano, Texas, is committed to both advancing innovation through its patent portfolio, and to returning value to its investors that paid more than $4 billion to Nortel—a cash infusion that will help Nortel discharge various debts and satisfy certain financial obligations to its former employees during bankruptcy.

41.     More than two dozen of Rockstar's employees are former Nortel employees, including former Nortel engineers, managers and attorneys.  Some of Rockstar's former Nortel employees were offered other jobs when Nortel collapsed, but turned them down based on the belief that working with Rockstar Bidco was a way to help former Nortel colleagues hurting from the bankruptcy.

### PLAINTIFF SPHERIX INCORPORATED

42.     Spherix Incorporated was launched in 1967 as a scientific research company.  Spherix's common stock trades on the NASDAQ Capital Market system under the symbol SPEX.

43.     Historically, Spherix has focused on biotechnology research and development.  Its research has led to numerous patents and patent applications relating to diverse innovative biotechnologies such as water purification, biodegradation management, and the use of D-tagatose for food and potentially medical and environmental applications.  Spherix continues to work on life sciences and drug development and presently is exploring opportunities in sports and nutritional supplement products relying on its D-tagatose natural sweetener as a GRAS (generally regarded as safe) ingredient.

44.     Spherix presently offers a diversified commercialization platform for protected technologies and has recently expanded into the telecommunications sector.  Spherix intends to expand its activities in wireless communications and telecommunication sectors including cordless telephones, cellular, antenna technology, Wi-Fi, and base station functionality.  As part of this expansion, Spherix acquired the Asserted Patents (among other IP assets) from Rockstar.  Under the terms of the agreement as reported in Spherix's SEC filings, Spherix acquired the Asserted Patents and related IP, and Rockstar received a significant minority stake in Spherix and a share of the Asserted Patents' proceeds, among other consideration.

45.     As a result of its patent acquisition from Rockstar, Spherix has formed a Technology Advisory Board to identify and address market opportunities for innovative technology, including telecommunications technology.  The Spherix Technology Advisory Board will be comprised of a number of former Nortel technology professionals, including former Nortel employee-inventors of the Asserted Patents.  Part of the purpose of the creation of the Technology Advisory Board is to reward and provide compensation to the inventors of the patents Spherix acquires.  Spherix's Technology Advisory Board members will serve as

independent consultants and will be provided an opportunity to become Spherix shareholders in exchange for their participation on the Technology Advisory Board.

46.     Spherix is committed to advancing innovation by active participation in all areas of the patent market and draws on portfolios of pioneering technology patents to partner with and support product innovation.  One objective of Spherix's patent licensing and enforcement program is the enforcement of intellectual property developed in North America against large foreign manufacturers that use such IP—without authorization—to make and expand sales of infringing systems and methods in the United States and Canada.

### THE VTECH DEFENDANTS

47.     VTech is the world's largest manufacturer of cordless telephones.  Defendant VTech Telecommunications and its parent, VTech Holdings, are Chinese-owned companies with headquarters in Hong Kong and cordless phone manufacturing facilities in China.  VTech promotes and sells its Chinese-manufactured cordless phones in the United States through Defendant VTech Communications, a wholly-owned subsidiary of Hong Kong-based VTech Holdings.

48.     For VTech's fiscal year ending March 31, 2013, VTech had $389.4 million in U.S. telecommunications revenue alone.  From September 2007 to the present, VTech's total revenue from U.S. cordless phones exceeds $2.6 billion.

49.     VTech has repeatedly stated that it is the largest manufacturer of U.S. cordless phones and has maintained its position as the number one supplier of U.S. cordless phones for the past several years.

50.     VTech's share of the U.S. cordless phone market exceeds 50%.  Together, the two biggest suppliers of cordless phones—VTech and Uniden Corporation—collect approximately 75% of all U.S. cordless phone revenue.

51.     VTech has publicly stated that its record revenue achieved each of the past few years—amid global economic uncertainty and rising labor costs in China—are the result of its strategy to raise prices on its products, together with reducing its costs through increased automation in manufacturing.  VTech has also publicly stated that it expects to gain additional U.S. cordless phone market share due to industry consolidation, and the additional shelf-space made available for VTech products as a result of industry consolidation.

52.     VTech's overall revenue for North America has risen 20% since Nortel filed for bankruptcy in 2009.

53.     In addition to VTech's U.S. phone revenue from sales of VTech-branded cordless phones, VTech also makes and sells AT&T-branded phones.  AT&T resides in this Judicial District.

54.     VTech's sale of AT&T-branded phones occurs through Defendant VTech Communications, doing business as Advanced American Telephones.  Prior to VTech's acquisition of Advanced American Telephones in April 2000, Lucent Technologies Consumer Products, L.P. ("LTCP") sold phones from its New Jersey-based facilities in Eatontown, Parsippany, and Murray Hill.  When VTech acquired the former LTCP manufacturing division in 2000, it shifted the production of cordless phones to China.

55.     In addition to VTech's leading position in the U.S. consumer cordless phone market, VTech introduced infringing phone products in the commercial phone area, entering the small business (SMB) phone segment in 2009.  According to VTech, its SMB cordless phone

products are gaining increasing traction in the market.  Particularly well-received has been the SynJ and Synapse small business phone system, which are being marketed and sold via office super stores and an expanding network of online retailers and other resellers.

56.     VTech manufactures the cordless phones it sells in the United States at facilities in China, and the phones are subsequently imported into the United States.

**THE ASSERTED PATENTS ARE PIONEER PATENTS COVERING CORE CORDLESS TECHNOLOGY**

57.     The Asserted Patents are pioneer patents.  Each Asserted Patent teaches and claims technology that advanced the state of the art in profound ways.  The core nature of the technology disclosed and claimed in the Asserted Patents is apparent from their early priority dates, as well as how often they have been cited—and continue to be cited—during the prosecution of patent applications filed by telecommunications industry leaders.  Specifically, AT&T, Cisco, CenturyLink, Lucent Technologies, Motorola, Nokia, Panasonic, Samsung, Sanyo, Vonage, Verizon—and even VTech itself—have all cited one or more of the Asserted Patents as prior art relevant to their pending patent applications, or faced PTO examiner rejections of pending claims based on the Asserted Patents, in their attempts to acquire patent protection for follow-on technology that sought to build on Nortel's pioneering work on the core features taught and claimed in the Asserted Patents.

58.     The core nature of the technology taught and claimed in the Asserted Patents is also apparent from how often they have been cited by PTO examiners as a basis for rejecting pending claims in patent applications—including claims pending in patent applications filed by telecommunications industry leaders.  For example, the Asserted Patents have been cited as a basis to reject pending claims in patent applications in no fewer than 90 office actions issued by a number of different PTO examiners.  Moreover, VTech, AT&T, Panasonic, and other industry

leaders have each faced multiple PTO examiner rejections of pending claims in later-filed applications based on the core teachings and disclosures of the Asserted Patents. In addition to the host of rejections issued based on the Asserted patents—which nearly always resulted in narrowing amendments to the rejected claims—at least 15 different patent applications were abandoned after the PTO rejected pending claims in light of one or more of the Asserted Patents. Many of those abandoned applications were filed by leading technology companies, including AT&T, Hitachi, and Nokia.

59.    The '599 Patent, filed in 1993, teaches and claims core technology that today is found in most cordless phones—and nearly all of VTech's cordless phone products. The claimed technology relates generally to enabling access to the information and functions on a cordless phone's base station through the phone's remote handsets. Such access, for example, can be used to access or edit caller or contact information stored on the base station.

a.    An illustration of the core nature of the technology taught and claimed in the '599 Patent is the fact that it has been cited as relevant prior art during the prosecution of more than 45 later-filed patent applications. To put that forward citation total in context, the '599 Patent has more forward citations than 67.8 % of all comparable United States patents. Moreover, many of the more than 45 forward citations to the '599 Patent arose during the prosecution of patent applications filed by leading technology companies. For example, the '599 Patent was cited during the prosecution of at least 5 later-filed patents assigned to AT&T. The '599 Patent was also cited during the prosecution of patents assigned to Samsung, Microsoft, Lucent, and Canon.

b.  A further illustration of the core nature of the technology taught and claimed in the '599 Patent is the fact that PTO examiners have cited the '599 Patent in at least 6 different office actions as a basis for rejecting pending claims in patent applications under examination.  In particular, pending claims in a Nokia application were rejected in 4 separate office actions, and ultimately resulted in Nokia abandoning its patent application.

60.  The '195 Patent, filed in 1996, is related to the '599 Patent through a priority claim on the face of the patent.  It teaches and claims comparable technology, namely enabling access to the information and functions on a cordless phone's base station through the phone's remote handsets.

a.  An illustration of the core nature of the technology taught and claimed in the '195 Patent is the fact that it has been cited during the prosecution of more than 57 later-filed patent applications.  To put that forward citation total in context, the '195 Patent has more forward citations than 96.7% of all comparable United States patents.  Moreover, the '195 Patent has also been repeatedly cited by leading technology companies.  In particular, the '195 Patent was cited during the prosecution *of at least two later-filed VTech patent applications*: the application that resulted in U.S. Patent No. 7,236,578 (directed to technology enabling remote access of caller ID information on the base station with a handset); and the application that resulted in U.S. Patent No. 7,689,233 (directed to technology enabling remote access to the base station's hands-free function using a handset). The '195 Patent was also cited during the prosecution of later-filed patents assigned to Lucent Technologies, Cisco, Nokia, and Panasonic.

    b.   A further illustration of the core nature of the technology taught and claimed in the '195 Patent is the fact that PTO examiners have cited the '195 Patent in at least 27 different office actions as a basis for rejecting pending claims in patent applications under examination.  In particular, two different PTO examiners issued a total of three office actions that cited the '195 Patent as a basis for ***rejecting pending VTech claims in two different VTech patent applications***.  Those PTO rejections resulted in narrowing amendments to VTech's pending claims.  Moreover, at least 5 patent applications were abandoned after different examiners issued office actions citing the '195 Patent as a basis for rejecting pending claims.  Specifically, AT&T, NETGEAR, and Microsoft each abandoned patent applications after receiving PTO office actions that cited the '195 Patent as a basis for rejecting pending claims.

61.    The '814 Patent, filed in 1996, teaches and claims technology related to automatically and intelligently processing incoming calls according to caller input.

    a.   An illustration of the core nature of the technology taught and claimed in the '814 Patent is the fact that it has been cited during the prosecution of more than 29 later-filed patent applications.  To put that forward citation total in context, the '814 Patent has more forward citations than 54.1% of all comparable United States patents.  This patent has also been repeatedly cited by industry leaders.  For instance, the '814 Patent was cited during the prosecution of at least 20 later-filed patents assigned to AT&T (including Bellsouth).  The '814 Patent was also cited during the prosecution of patents assigned to Alcatel-Lucent, Facebook, IBM, Lucent Technologies, and Sanyo.

b.   A further illustration of the core nature of the technology taught and claimed in the '814 Patent is the fact that PTO examiners have cited the '814 Patent in at least 9 different office actions as a basis for rejecting pending claims in patent applications under examination.  In particular, different PTO examiners issued rejections to pending claims in three different AT&T patent applications, and also rejected pending claims in an Alcatel-Lucent patent application.  Many of the 9 PTO office action rejections citing the '814 Patent resulted in the applicant filing narrowing claim amendments.

62.   The '899 Patent, filed in 2000, teaches and claims technology related to data-network-based telecommunications with intelligent endpoints.  Such technology can, for example, allow a user to access and select information stored on a data server using an interface on a handset, or allow a user to download contacts from a cell phone to a cordless phone.

a.   An illustration of the core nature of the technology taught and claimed in the '899 Patent is the fact that it has been cited during the prosecution of more than 45 later-filed patent applications.  To put that forward citation total in context, the '899 Patent has more forward citations than 90.2% of all comparable United States patents.  This patent has also been repeatedly cited by industry leaders.  For instance, the '899 Patent was cited during the prosecution of at least 25 later-filed patents assigned to Cisco and at least 9 assigned to Vonage Network.  The '899 Patent was also cited during the prosecution of patents assigned to Nokia, HP, and Samsung.

b.   A further illustration of the core nature of the technology taught and claimed in the '899 Patent is the fact that different PTO examiners have cited the '899 Patent

in at least 10 different office actions as a basis for rejecting pending claims in

patent applications under examination.  In particular, at least 3 patent applications

went abandoned after the applicant received rejections to pending claims citing

the '899 Patent—including two applications that AT&T (Bell South and SBC)

abandoned.

63.   The '614 Patent, filed in 2000, teaches and claims technology enabling different

types of telecommunications devices to communicate with each other.  Such technology can, for

example, enable a device based on one network protocol (e.g., Bluetooth) to communicate with a

device based on a different network protocol (e.g., DECT).

a.   An illustration of the core nature of the technology taught and claimed in the '614

Patent is the fact that it has been cited during the prosecution of more than 95

later-filed patent applications.  To put that forward citation total in context, the

'614 Patent has more forward citations than 99.9% of all comparable United

States patents.  This patent has also been repeatedly cited by industry leaders.  For

instance, the '614 Patent was cited during the prosecution of at least 41 later-filed

patents assigned to CenturyLink (Embarq Holdings), at least 14 assigned to Cisco,

and at least 5 assigned to Verizon.  The '614 Patent was also cited during the

prosecution of patents assigned to Motorola, Microsoft, and Nokia Siemens.

b.   A further illustration of the core nature of the technology taught and claimed in

the '614 Patent is the fact that PTO examiners have cited the '614 Patent in at

least 38 different office actions as a basis for rejecting pending claims in patent

applications under examination.  In particular, multiple different PTO examiners

cited the '614 Patent as a basis for rejecting pending claims in patent applications

filed by Cisco, CenturyLink, and Samsung.  Moreover, at least 6 patent applications were abandoned after the applicant received PTO examiner rejections to pending claims citing the '614 Patent—including applications abandoned by Telcordia Technologies, Matsushita, and Hitachi.

### THE VAST SCOPE OF VTECH'S WILLFUL INFRINGEMENT OF THE ASSERTED PATENTS

64.     The scope of VTech's infringement of the Asserted Patents has been and continues to be immense.  The vast majority of VTech's cordless phone revenue from September 2007 to the present is generated from products implementing technology that originated at Nortel and infringe the Asserted Patents.

65.     Nearly all of VTech's residential cordless phones with base stations utilize the technology claimed in the '599 and '195 Patents.  Most of VTech's phones also implement network directory functionality as claimed in the '899 Patent.  In addition, VTech's line of "Connect to Cell" phone systems implement the very "method and system for communications between different types of devices" claimed in the '614 Patent.  And VTech's AT&T-branded line of business phones—which VTech's 2013 Annual Report specifically lauds as driving increased North American revenue—specifically advertises and implements the same "auto attendant" technology disclosed and claimed in the '814 Patent.

66.     Over the last six years—from September 2007 to the present—***VTech's U.S. revenue from cordless phones that infringe one or more claims of one or more of the Asserted patents exceeds $2.08 billion***, which is approximately 80% of VTech's total U.S. cordless phone revenue since September 2007.

67.     In addition to VTech's more than $2 billion in revenue from infringing sales over the last six years, VTech has stated to its shareholders that over the next several years it expects

to increase its revenue from cordless phones sold in the U.S due to industry consolidation.  None of the Asserted Patents have expired.  The two most recently issued Asserted Patents, the '899 and '614 Patents, do not expire until January 2020 and April 2020, respectively.

68.     VTech markets its phones by specifically emphasizing technology that infringes the Asserted Patents.  VTech's website announces discounted "amazing deals" and "exclusive offers" for products featuring the patented technology, and even elevates the patented technology to the forefront of each product's advertising.  VTech thus relies upon the technology of the Asserted Patents to persuade its customers to purchase and use VTech's infringing products.[2]  By way of example only, VTech's "best seller" DS6511-3 model prominently invites the customer to purchase the phone system for the specific purpose of using the inter-device communications technology disclosed and claimed in the ' 614 Patent:[3]





---

[2] *See* http://www.vtechphones.com/ (last visited Aug. 23, 2013).
[3] http://www.vtechphones.com/products/product_detail/1953 (last visited Aug. 23, 2013).

69.     By way of further example, VTech specifically promotes the infringing auto-attendant features of the "SynJ" business phones it manufactures under contract with AT&T. VTech manufactures the SynJ phone line for Dallas-based AT&T while doing business as Advanced American Telephones, an entity VTech acquired in 2000, and which merged into VTech Communications, Inc. in 2006.  As set forth in a VTech press release on Oct. 22, 2011: "SynJ . . . enhances business communications with auto attendant[.]"[4]  AT&T's website, in turn, advertises the SynJ phone as specifically featuring the auto-attendant technology that infringes the '814 Patent:[5]



**Auto attendant on each line**
Customize call handling during business hours and after. The auto attendant for each line can answers outside calls, provides callers with a company directory and route calls to the appropriate extension.

70.     In addition to its focus on marketing and advertising infringing features of its phones in the U.S., VTech also charges a price premium for phones that include certain infringing features of its cordless phones.

71.     The infringing features of VTech's phones are the basis for customer demand of those phones.  In addition to VTech's advertising and promotion of infringing features, VTech publishes on its website no less than 30 pages of consumer testimonials lauding the benefits of the infringing features of VTech's phones.[6] Moreover, VTech also sponsors and publishes a blog

---

[4] *See* VTech Press Release, New SynJ Phone Model from AT&T Improves Flexibility and Scalability for Small Businesses, http://www.vtech.com/en/press/press-release/2011/352-new-synj-phone-model-from-atat-improves-flexibility-and-scalability-for-small-businesses (last visited Aug. 23, 2013).
[5] http://telephones.att.com/products/detail/1568 (last visited Aug. 23, 2013).
[6] *See* http://www.vtechphones.com/about-us/in-the-news (last visited Aug. 28, 2013).

on its website, which features instructions to consumers about how to operate and use infringing

cordless phones, and promotes the benefits of the infringing features of VTech's phones.[7]

72.     VTech manufactured, promoted, and sold the infringing technology with

knowledge of certain Asserted Patents, and knowledge that its phones infringe those Asserted

Patents.

## COUNT I

### INFRINGEMENT OF U.S. PATENT NO. 5,581,599

73.     Spherix refers to and incorporates herein the allegations of paragraphs 1 through

72 above.

74.     VTech is liable for direct and indirect infringement of the '599 Patent pursuant to

35 U.S.C. § 271.

75.     VTech has directly infringed and continues to infringe, either literally or under the

doctrine of equivalents, one or more claims of the '599 Patent by making, using, offering to sell,

selling, or importing, in this judicial district and elsewhere in the United States, certain cordless

phones that allow the user to access or control base-station information or functions through an

interface on the handset, including, for example, the BS2621, QW2652, CS6228, CS6229,

DS6221, DS6222, DS6520, DS6521, DS6522, ev2625, ev2626, LS6225, and LS6226 series and

all other cordless-phone series with remote-directory-access and like capabilities (the "'599-

Infringing Phones").

76.     VTech has indirectly infringed and continues to indirectly infringe the '599 Patent

by providing end-users with '599-Infringing Phones and encouraging end-users to infringe the

patent with the phones.  VTech provides technical support, marketing materials, operation

---

[7] *See* http://blog.vtechphones.com/blog/ (last visited Aug. 28, 2013).

manuals, and other documentation instructing and encouraging end users to use the phones in a manner that infringes.  For example, VTech's user's manual for the CS6228 and CS6229 family of phones[8] provides detailed instructions on using the handset to access and manipulate information stored on the base station, including caller id information, in a manner that infringes the '599 Patent.  Further, the '599-Infringing Phones contain components (e.g., configured processor-based circuits) that are specially designed to implement the '599 Patent's claimed technology and have no substantial non-infringing use.

77.     VTech provided the '599-Infringing Phones and encouraged end-users to use the phone in an infringing manner with full knowledge of the '599 Patent and the end-user's infringement, or in willful blindness to such.  For example, VTech cited the '195 Patent in its applications that resulted in U.S. Patents No. 7,236,578 and No. 7,689,233.  The '195 Patent was known to VTech no later than March 28, 2005, when the PTO used it to reject pending claims in VTech's application that issued as U.S. Patent No. 7,236,578.  The '195 Patent clearly states on the face of the patent that it is a "continuation of" the '599 Patent.  The PTO provided notice of the '599 Patent to VTech when it provided notice of the '195 Patent.

78.     VTech knew that products it sold from at least September 2007 infringed the '599 Patent, as the PTO made VTech aware of that patent no later than March 28, 2005.  Since then, VTech has acted, and continues to act, with willful, deliberate, and reckless disregard of the '599 Patent.

79.     Spherix has suffered and continues to suffer damages as a result of VTech's infringement of the '599 Patent.  Pursuant to 35 U.S.C. § 284, Spherix is entitled to recover

---

[8] *See, e.g.*, VTech, 2 Handset Answering System with Caller ID/Call Waiting, http://www.vtechphones.com/products/product_detail/35, "SUPPORT & MANUALS TAB" (last visited Aug. 26, 2013).

damages in an amount that is no less than a reasonable royalty from VTech for its infringing acts. Spherix is further entitled to enhanced damages for VTech's willful infringement of the '599 Patent.

80.     Unless VTech is enjoined from further infringement of the '599 Patent, VTech's infringement will continue to damage Spherix, causing irreparable harm for which there is no adequate remedy at law.

**COUNT II**

**INFRINGEMENT OF U.S. PATENT NO. 5,752,195**

81.     Spherix refers to and incorporates herein the allegations of paragraphs 1 through 72 above.

82.     VTech is liable for direct and indirect infringement of the '195 Patent pursuant to 35 U.S.C. § 271.

83.     VTech has directly infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more claims of the '195 Patent by making, using, offering to sell, selling, or importing, in this judicial district and elsewhere in the United States, certain cordless phones that allow the user to access or control base-station information or functions through an interface on the handset, including, for example, the BS2621, QW2652, CS6228, CS6229, DS6221, DS6222, DS6520, DS6521, DS6522, ev2625, ev2626, LS6225, and LS6226 series and all other cordless-phone series with remote-directory-access and like capabilities (the "'195-Infringing Phones").

84.     VTech has indirectly infringed and continues to indirectly infringe the '195 Patent by providing end-users with '195-Infringing Phones and encouraging end-users to infringe the patent with the phones.  VTech provides technical support, marketing materials, operation

manuals, and other documentation to instruct and encourage end users to use the phones in a manner that infringes.  For example, VTech's user's manual for the CS6228 and CS6229 family of phones provides detailed instructions on using the handset to access and manipulate information stored on the base station, including caller id information, in a manner that infringes the '195 Patent.  Further, the '195-Infringing Phones contain components (e.g., configured processor-based circuits) that are specially designed to implement the '195 Patent's claimed technology and have no substantial non-infringing use.

85.     VTech provided the '195-Infringing Phones and encouraged end-users to use the phone in an infringing manner with full knowledge of the '195 Patent and the end-user's infringement, or in willful blindness to such.  For example, VTech cited the '195 Patent in its applications that resulted in U.S. Patents No. 7,236,578 and No. 7,689,233.  The '195 Patent was known to VTech no later than March 28, 2005, when the PTO used it to reject pending claims in VTech's application for U.S. Patent No. 7,236,578.

86.     VTech knew that products it sold from at least September 2007 infringed the '195 Patent, as the PTO made VTech aware of that patent no later than March 28, 2005.  Since then, VTech has acted, and continues to act, with willful, deliberate, and reckless disregard of the '195 Patent.

87.     Spherix has suffered and continues to suffer damages as a result of VTech's infringement of the '195 Patent.  Pursuant to 35 U.S.C. § 284, Spherix is entitled to recover damages in an amount that is no less than a reasonable royalty from VTech for its infringing acts. Spherix is further entitled to enhanced damages for VTech's willful infringement of the '195 Patent.

88.     Unless VTech is enjoined from further infringement of the '195 Patent, VTech's infringement will continue to damage Spherix, causing irreparable harm for which there is no adequate remedy at law.

### COUNT III

#### INFRINGEMENT OF U.S. PATENT NO. 5,892,814

89.     Spherix refers to and incorporates herein the allegations of paragraphs 1 through 72 above.

90.     VTech is liable for direct and indirect infringement of the '814 Patent pursuant to 35 U.S.C. § 271.

91.     VTech has directly infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more claims of the '814 Patent by making, using, offering to sell, selling, or importing, in this judicial district and elsewhere in the United States, certain phones that include auto attendants, including the Synapse (e.g., SB67010, SB67020, SB67025, SB67030, and SB67031), SynJ (e.g., SB67118 and SB67138), and Syn248 (e.g., SB35020, ) series and all other phone series with auto-attendant and like capabilities (the "'814-Infringing Phones").

92.     Spherix has suffered and continues to suffer damages as a result of VTech's infringement of the '814 Patent.  Pursuant to 35 U.S.C. § 284, Spherix is entitled to recover damages in an amount that is no less than a reasonable royalty from VTech for its infringing acts. Spherix is further entitled to enhanced damages for VTech's willful infringement of the '814 Patent.

93.     Unless VTech is enjoined from further infringement of the '814 Patent, VTech's infringement will continue to damage Spherix, causing irreparable harm for which there is no adequate remedy at law.

## COUNT IV

### INFRINGEMENT OF U.S. PATENT NO. 6,614,899

94.     Spherix refers to and incorporates herein the allegations of paragraphs 1 through 72 above.

95.     VTech has directly infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more claims of the '899 Patent by making, using, offering to sell, selling, or importing, in this judicial district and elsewhere in the United States, equipment enabling phones and other telephony devices to connect to a data network (e.g., DECT, Bluetooth, IP) and access functions or a directory through the network, including, for example, the DS6151, DS6421, DS6521, DS6421, DS6472, DS6511, DS6521, DS6522, DS6641, DS6671, DS6670, and LS6191series and all other phone series with DECT or Bluetooth access to a directory, or like capabilities (the "'899-Infringing Phones").

96.     Spherix has suffered and continues to suffer damages as a result of VTech's infringement of the '899 Patent.  Pursuant to 35 U.S.C. § 284, Spherix is entitled to recover damages in an amount that is no less than a reasonable royalty from VTech for its infringing acts. Spherix is further entitled to enhanced damages for VTech's willful infringement of the '899 Patent.

97.     Unless VTech is enjoined from further infringement of the '899 Patent, VTech's infringement will continue to damage Spherix, causing irreparable harm for which there is no adequate remedy at law.

## COUNT V

### INFRINGEMENT OF U.S. PATENT NO. 6,965,614

98.     Spherix refers to and incorporates herein the allegations of paragraphs 1 through 72 above.

99.     VTech has directly infringed and continues to infringe, either literally or under the doctrine of equivalents, one or more claims of the '614 Patent by making, using, offering to sell, selling, or importing, in this judicial district and elsewhere in the United States certain phones that enable connection to a mobile phone, including the DS6421, DS6472, DS6511, DS6521, DS6522, DS6641, DS6671, DS6670, and LS6191 series and all other phone series with connect-to-cell and like capabilities (the "'614-Infringing Phones").

100.     Spherix has suffered and continues to suffer damages as a result of VTech's infringement of the '614 Patent.  Pursuant to 35 U.S.C. § 284, Spherix is entitled to recover damages in an amount that is no less than a reasonable royalty from VTech for its infringing acts. Spherix is further entitled to enhanced damages for VTech's willful infringement of the '614 Patent.

101.     Unless VTech is enjoined from further infringement of the '614 Patent, VTech's infringement will continue to damage Spherix, causing irreparable harm for which there is no adequate remedy at law.

## JURY DEMAND

102.     Spherix hereby requests a trial by jury in Dallas, Texas pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

103.    Spherix respectfully requests the Court to enter judgment in its favor against the

VTech Defendants, granting the following relief:

A.      Judgment in Spherix's favor on Counts I, II, III, IV, and V;

B.      An award to Spherix of damages adequate to compensate it for the VTech

Defendants' acts of patent infringement, but in no event less than a

reasonable royalty, together with interest and costs as fixed by the Court,

pursuant to 35 U.S.C. § 284;

C.      An award to Spherix of enhanced damages, up to and including treble

damages, pursuant to 35 U.S.C. § 284, for the VTech Defendants' acts of

willful patent infringement;

D.      A grant of permanent injunction, pursuant to 35 U.S.C. § 283 against the

VTech Defendants, enjoining them from further acts of infringement, or in

the event injunctive relief is unavailable, a lump sum award (in addition to

past damages) based on a reasonable royalty applied to forecasted sales of

infringing products through the expiration date of the last Asserted Patent

to expire;

E.      An award to Spherix of its costs of suit and reasonable attorneys' fees

pursuant to 35 U.S.C. § 285 due to the exceptional nature of this case; and

F.      Any further relief that the Court deems just and proper.

Dated:  August 30, 2013                    Respectfully Submitted:

                                           */s/ Paul J. Skiermont*
                                           Paul J. Skiermont (Bar. No. 24033073)
                                           G. Donald Puckett (Bar No. 24013358)
                                           Donald E. Tiller (Bar No. 24066197)
                                           Eliot J. Walker (Bar No. 24058165)
                                           **SKIERMONT PUCKETT LLP**
                                           2200 Ross Ave, Suite 4800W
                                           Dallas, TX 75201
                                           Tel:  (214) 978-6600
                                           Fax: (214) 978-6601
                                           paul.skiermont@skiermontpuckett.com
                                           don.tiller@skiermontpuckett.com
                                           eliot.walker@skiermontpuckett.com

                                           ***Counsel for Plaintiff Spherix Incorporated***